Silver Cross Hospital and Medical Centers, Appellant Cross Appellee by Jennifer Meadenhall v. The Medical Protective Company, Appellate Cross Appellant by James Horton. Ms. Meadenhall? May it please the Court, my name is Jennifer Meadenhall and again I represent the Appellant Cross Appellee, Silver Cross Hospital and Medical Centers. The premier issue in this appeal is what amount, if any, Silver Cross must pay towards exhaustion of an SIR for claims involving employee physicians with their own physician's liability policies before MedPro's duty to indemnify Silver Cross is triggered. The trial court in this case determined in error that Silver Cross's SIR is always $2 million regardless if an underlying claim implicates coverage under a separate physician's liability policy. And for the reasons that I'm going to discuss today, Silver Cross respectfully requests this court to reverse the trial court's determination in that regard. Contrary to the finding of the trial court, the MedPro policy language supports that a physician's liability policy replaces Silver Cross's SIR and the predicate for this argument is the definition of the term self-insured retention. Now in this particular instance, that term was given an amended definition pursuant to an endorsement to this policy for which Silver Cross negotiated and paid additional premiums. Self-insured retention, as defined by the endorsement, means the total of the applicable limits of liability of the insurance identified in the schedule of underlying insurance plus the limits of liability of any other applicable insurance. MedPro focuses on the word total to suggest that Silver Cross's SIR consists of a $2 million payment in addition to the $1 million liability limit of the physician's liability policy. But that's not what the MedPro policy says, and more importantly, it's not what Silver Cross bargained for. Let me, can I ask you this one question to get myself in the right frame of mind here? Is, you said that's possible. Is, in your opinion, is this policy, is there any ambiguity in the policy? We have made that argument and preserved that argument for appeal, yes. Our first two arguments is that, are that the MedPro policy supports that a physician's liability either replaces, a physician's liability policy either replaces or reduces Silver Cross's SIR. And in the alternative, if the court finds that both my proffered interpretation of the policy and MedPro's proffered construction of the policy are both reasonable readings of the SIR endorsement, then yes, there is an ambiguity. Okay. And. All right. I just want to make sure I'm, so at this stage, your argument now is, you're arguing that portion that says it's not ambiguous. This is what the policy says. And you agree that until we get to your ambiguous argument, we don't consider all this parole evidence, right? I would agree with that, yes. All right, okay. Yes. As long as you're interrupted, I have two questions. Okay. The first one is, it appears to me that these are claims made policies. Is that correct? I believe so, yes. Why is the, is it Frigo or Frigo? Frigo. Why is the Frigo claim under the 2000-2001 policy? That's an interesting issue because, of course, Frigo was filed, the lawsuit was filed, and I assume this is what you're getting at, in October of 2000, and we have a policy period here that begins in November of 2000. The record doesn't make that exactly clear why that is. I know that the claim was reported to MedPro within the 2000-2001 policy period. The lawsuit was filed, but the claim and the lawsuit weren't reported to MedPro until a couple of months later, and that's why I believe it was handled as falling within the 2000-2001 MedPro policy. So everybody agrees that the same policy applies to both of these claims? There's no dispute as to that in the record. That has been the assumption, that the claim was handled as falling within the 2000-2001 policy period, yes. That's okay. And then my second question is the self-insured retention for Silver Cross covers hospital liability. The self-insured retention under the doctor's policy covers his professional liability, and if you look at the language in the insurance policy that says it's the total of this plus this, doesn't it seem like the self-insured retention should be computed separately for both of those? No, and I'll tell you why. MedPro wants to focus on the word total to suggest, just as you've said, that we add everything we see in the schedule of underlying insurance, and that's how we arrive at Silver Cross's SIR. But a reasonable read of the SIR endorsement is to say the total of the applicable limits of liability of the insurance identified in the schedule of underlying insurance. Well, one of the policies, one piece of insurance that appears in the schedule of underlying insurance is the physician's liability policy, so that a reasonable reading, and we would submit the only reasonable reading of the SIR endorsement, is that to say the total of the applicable limits of liability refers to the $1 million liability limit of the physician's liability policy. The language about plus any other applicable limits of liability, we don't get there, because what we're talking about is what's identified in the schedule of underlying insurance. That second clause, beginning with the word plus, assumes that there might be another policy out there that isn't identified in the schedule of underlying insurance. So we don't get to the plus portion of the clause at all, because what we're dealing with is a physician's liability policy that did appear in the schedule of underlying insurance. And it's also important to note, for comparative purposes, and so that I make the point that the SIR gets replaced by the physician's liability policy, it's useful to look at how SIR was defined before the endorsement was issued. Before the endorsement, SIR carried the definition of the amount of loss and claims expense as stated in item four of the declarations. And if you look at item four of the declarations, you'll see a $2 million per medical incident figure. Well, the endorsement has to be accorded a purpose and meaning. Silver Cross paid an extra premium for it. And that purpose and meaning is that Silver Cross's SIR can be something other than $2 million, and the something other is that it can be the $1 million liability limit of the physician's liability policy. The provision doesn't read the combined total of the applicable limits of liability of all the insurance identified in the schedule of underlying insurance. To get to where MedPro wants you to be, you're going to have to read into the SIR endorsement terms that aren't there, which, of course, you can't do. That's not what the MedPro policy says. Now, our other argument is that the SIR can be reduced by a physician's liability policy. And the predicate for that argument is in the second sentence of the SIR endorsement. And that sentence provides that only those claims which come within the scope of the coverage provided by this policy shall apply toward the exhaustion of the self-insured retention for each medical incident, occurrence, and aggregate. To make my point, again, it's helpful to look at how the SIR term was defined before this endorsement was issued. Before the endorsement, the definition of SIR provided that the payment of SIR shall be the sole obligation of the insured and other insurance which may be applicable to the loss and or claims expense may not be used by the insured to fulfill the self-insured retention obligation. That language is gone. So the import of the endorsement is that other insurance can be used by the insured to satisfy and fulfill its self-insured retention obligation. Now, you won't see MedPro make very much in the way of a meaningful response to this argument. They didn't in the briefs, and they didn't for good reason, because this is the position that MedPro itself adopted prior to this litigation's inception. The claims attorney handling the Frigo and the Judnick claim read all the materials, read all the pertinent policy provisions, and himself derived that a physician's liability policy can be used to partially exhaust Silver Cross's SIR. Now, in the alternative, as I said, we do have the argument that the policy provision at issue here, the SIR endorsement, is ambiguous. If the court finds that both our reading of the policy provision and MedPro's reading of the policy provisions are reasonable, then we have a situation of ambiguity. The import of that, of course, is that the evidence of the party's intentions and circumstances surrounding the formation of this contract all become admissible. And also of great importance is the fact that the policy has to be construed in the light most favorable to Silver Cross and against MedPro because MedPro is the one who drafted it. And the record is full of evidence to support what the party's intentions were as to how this SIR endorsement was to operate. And some of that evidence includes the testimony of Josh Zirin. He was a project manager with Dion Derrell. Mr. Zirin was brought in as an actuary and insurance consultant with Silver Cross, and he set out to eliminate gaps in coverage. He set out to make coverage seamless in these situations where an underlying claim implicates coverage under a physician's liability policy. That evidence is admissible to come in and help explain what this SIR endorsement means. And Mr. Zirin testified, among other facts, that the prior policy period, the 99-00 policy period, and this MedPro policy was a renewal of that policy, that the physician's liability policy appeared in the schedule of underlying insurance in that policy. And the import of that was to make coverage seamless, that MedPro's excess coverage would apply directly above the exhaustion of the physician's liability policy. Now, even if Your Honors are not inclined to agree with our policy interpretation arguments, we have asserted that under the circumstances, the waiver and estoppel doctrines ought to be applied to MedPro. And there is ample evidence in the record to support that MedPro acted inconsistent with an intent to have Silver Cross pay a $2 million SIR for the Frigo claim. What is that evidence, briefly? There's correspondence in the record in the year 2003 between Robert Abney, who's MedPro's claims attorney, and Donna Croy, who's MedPro's underwriter. And they're going back and forth about what does this endorsement mean, and the two of them can't even agree on what it means, and they're MedPro's employees. Mr. Abney, looking again at the whole policy, came to the conclusion that a physician's liability policy can go towards the exhaustion of Silver Cross's SIR. As a second category of evidence, we have correspondences in the year 2004, wherein Mr. Abney, in no uncertain terms, tells Silver Cross and its representatives, your SIR as to the Frigo claim is $1.1 million, not $2 million. We have this in the record. Now, MedPro will tell you that those communications are settlement negotiation documents, that they are offers of compromise, and we would submit to you that they are no such thing. They are not properly read in that context. Counselor, you have one minute or two minutes. Did your client change his position or was it prejudiced in any way by any of these statements by MedPro's employees? The prejudice is that we operated all along believing that MedPro had adopted one of our articulated interpretations of the policy, only to have MedPro subsequently change its position on us, which forced us to file the declaratory judgment action. Okay, but other than that, it wouldn't have done anything differently? As to the – that goes to estoppel, but it won't, obviously, for waiver purposes. There's no element of prejudice or detriment that we have to show. So, I mean, if I'm forced to tell you it's the stronger case for waiver over estoppel, absolutely, I will tell you that. Because of the prejudice and detriment factor. I did want to briefly add that MedPro will tell you that the 2004 communications or settlement communications have already conveyed that we disagree on that point. And the other interesting point is MedPro sued Silver Cross here for a bad faith duty to settle as to the Frigo claim. So MedPro put in its pleadings, paraphrased these same communications in their pleadings. They paraphrased them, put them at issue, and then say, but no court, you can't look at those same communications to evaluate Silver Cross's waiver and estoppel arguments. That position is not tenable. The other important key piece of evidence we have to support the waiver claim is that MedPro's bad faith duty to settle counterclaim is predicated not on the position that we had a duty to settle within a $2 million SIR, but that our SIR was $1.1 million. That's an admission in MedPro's pleadings as to one of our Crawford policy interpretation arguments. Absent any further questions, I want to hear what Mr. Horstman has to say as to the Cross appeal before I direct any argument. You will have time to reflect. I do have one more factual question, and I should know this, and I think that you answered it, something you said earlier. But in the briefs, you kept talking about, both of you, the physician's own liability policy under Fireman's Fund. Yes. It was not ever clear to me that that was the same insurance policy that's in your schedule of insurance. No one's disputing that it is not. The schedule of underlying insurance is referenced to that Fireman's Fund policy is the physician's liability policy that we're talking about. That Dr. Kirchner and Dr. Baker were using. Correct. Yes. Thank you. Thank you. Mr. Horstman. Good morning. May it please the Court. My name is Jim Horstman. I represent Medical Protective. First, I'd like to thank the Court for having oral argument. I know sometimes it seems it might be faster without it, but it's important to the process, and I appreciate it. The issues on Silver Cross's direct appeal and the issues on MedPro's cross appeal are fundamentally different. The issues on the direct appeal are determined specifically by the language of the insurance policy. MedPro's issues are not determined by the language of the insurance policy. It's our position, as was said in the briefs, that the trial court properly found that Silver Cross has to satisfy a $2 million SIR as to each medical incident. It really just comes down to this amended definition of what self-insured retention means. And we do dwell on the word total in that definition because it's the operative part of it. And that language quoted at page 5 of the blue brief is the total of applicable limits of liability of the insurance identified in the schedule of underlying insurance plus the applicable limits of liability of any other applicable insurance. Now, essentially what Silver Cross is asking the Court to do is to read out these words total and plus and essentially to read in language that isn't there, that the presence of other insurance policies will reduce or replace limits for purposes of computing what the SIR is. There's nothing at all in this definition of self-insured retention that even remotely supports the proposition that you're supposed to reduce the amount of the self-insured retention. All of the language, the total and the plus, brings across the idea that you bring all of the applicable policies in to determine what the self-insured retention is. So the more underlying insurance they buy, the larger their self-insured retention? Yes. So if they bought these physicians that had $2 million policies or $5 million policies, their self-insured retention would have jumped? Yes, it would have jumped. And this is reflected, of course, in the premium. This is an excess policy. It's reflected in the premium. All of the underlying policies, whether they be purchased by the hospital or be purchased by the physicians, are included in identifying what the level of the self-insured retention is. I just mentioned premium, incidentally, because I don't think it means an act of law here, but I think the record does not show that Silver Cross paid additional money for this definition. The policy itself was more expensive than the year before, but that's frequently the case with insurance policies. The cost of insurance rises. There's no testimony in this case that says that Silver Cross paid more money to get this more narrow, less advantageous, perhaps, definition of self-insured retention. So our belief is that the language of this self-insured retention definition is crystal clear, and it's been remarked it amends one that had been there before. Silver Cross tries to get away from this clear language in a few ways. They talk a lot about what their subjective intent was when they purchased this insurance. In the briefs, we raise a lot of issues about admissibility of evidence. Cut to the chase. There's no evidence in this case that Silver Cross ever shared that subjective intent with Medical Protective, none whatsoever. They may have, in their heart of hearts, believed that they needed a different kind of insurance, but there's no evidence that they ever told MedPro about it, so it's irrelevant. The waiver contention. Again, we raise a lot of arguments about admissibility of evidence, but it comes down to this. There's no evidence, even circumstantial, that Medical Protective waived its right to insist upon satisfaction of the SIR. There just isn't any. And it's interesting. If the court will look at the opening brief where Silver Cross makes this argument, pages 30 through 32, they don't even cite any parts of the record. These are just arguments that they make. Now, what they have to show is that Medical Protective intentionally relinquished the right to this self-insured retention, bearing in mind it's at least a $2 million issue. They cite the conversations between Mr. Abney and people in his own office. Now, think about this. They're saying it's a waiver for Abney to send in e-mails to people in his own office talking about what the policy means. These were private e-mails of Medical Protective, never meant to see the light of day outside of Medical Protective. The court only knows about them because Silver Cross filed this lawsuit and got these documents in discovery. They were private communications within the company. They certainly do not bespeak a waiver by Medical Protective. It never went outside of Medical Protective at the operative times. Silver Cross also talks about these communications between Abney and Mr. Jars. And we have said that they're not admissible because they were settlement discussions. Silver Cross argues, oh, no, they weren't. It's not a matter for the lawyers to argue. It's a matter of the testimony. Only one person testified as to the context of these conversations, Robert Abney. He said these communications with Ted Jars were part of the settlement discussions that they had. The only one who could have testified to the contrary is Ted Jars. And Silver Cross chose not to depose him. So the testimony is entirely one-sided. These were communications within settlement discussions. So is your position that underlying documents that are examined and discussed during settlement negotiations are barred rather than just the offers and acceptances or rejections, the negotiating part itself? The discussions. Because here they were, Jars and Abney were trying to explain their positions to one another. And Abney took a compromise position to try to persuade Jars as to his view of what the SIR was. So I'd say the discussions themselves. Did I answer that? Well, you did. But I'm having trouble with your answer. Because you could theoretically bar consideration of all kinds of relevant documents just by discussing them during settlement negotiations. I didn't mean to go that far. If they were looking at documents, what I meant to say was that the conversations between Abney and Jars are part of the settlement discussions. Here they specifically were debating what the policy meant and what Silver Cross's obligations were. And they were discussing these emails, these correspondence? No. No. This was separate where these Abney and Jars were just saying what the policy means and what it requires. Same kind of problem with their estoppel argument. Again, you look at the part of the white brief that talks about estoppel in this context, pages 33 through 35. No citations to the record. There's a reason why. There's no evidence of detrimental reliance. None whatsoever in the record. So our position is the trial court got it right on the SIR issue. Policy is clear. It requires Silver Cross to pay a $2 million SIR to each medical incident. We argue in the briefs about the judgment interest issue. I'm not going to go into that. That comes in to a similar analysis. It focuses on a particular language within the policy that requires that MedPro pays claim expense. And this is quoted, the language is quoted at page 41 of the blue brief. They pay claim expense only with respect to that portion of the judgment that exceeds the remaining applicable self-insured retention. So bottom line is it's an excess policy. MedPro pays loss above the SIR. And then it also pays judgment interest that accrues on the loss above the SIR. It's clearly articulated in the definition. But what I'm more interested in talking about, of course, is the cross appeal. We have two issues here that are not determined by contract language. We think the trial court erred in two ways. First, a summary judgment issue. The trial court incorrectly ruled as a matter of law that MedPro impliedly waived its right to enforce upon the SIR with respect to the judgment claim. Ruled as a matter of law. And the second issue is the trial ‑‑ this is a 2615 issue. The trial court improperly dismissed MedPro's bad faith claim or claim based on breach of the duty of good faith and fair dealing. What evidence would you have produced at a trial on that judgment issue that wasn't produced? On the waiver? At the summary judgment stage. On whether we waived the SIR? Yeah. What would you have proved at a trial? What evidence would have been brought out at a trial that wasn't already there at the summary judgment stage? Well, it's interesting. That would have been factually relevant, materially factual. Silver Cross has argued that MedPro, by its conduct, impliedly waived the SIR. They never deposed the gentleman at Medical Protective who was handling the claim, Gary Deakley. Gary Deakley, who they knew. Essentially, they're saying that his delay or inaction constitutes a waiver. Yet they never brought before the trial court any of his testimony. They're just looking at the documents in the claim file without any testimony from him or anybody else to go to this concept of theirs. That's its claim. First thing to know about this is there's nothing in the policy and there's nothing in the law that says how quickly an insurer has to move to collect the SIR. Nothing, because usually it's in the insurer's self-interest to try to get that money back quickly. So they cite nothing in the law, nothing in the policy to say how quickly MedPro has to move to get the SIR back. The other thing to know is that it's undisputed that MedPro did make a formal written demand for payment of the SIR on March 9, 2007. Counselor, you have two minutes. Thank you. That was just weeks after MedPro paid the Judnick settlement. Just weeks. There's no case law. There's nothing else out there that says waiting a couple of weeks before you demand the SIR is to wait too long, much less to be a waiver. And then finally, to keep in mind, is that while the entire time Judnick was being negotiated and settled, this case is pending. This case in which Silvercross filed and they said, we don't have to pay that SIR. They certainly knew what MedPro's position was, not that that's important because the issue again goes to waiver. What did Medical Protective do to impliantly waive its right to this $2 million SIR? I submit there's no evidence, but very clearly it can't be determined as a matter of law that MedPro waived its right to the SIR. They never said anything. Silvercross never brought the guy in to explain, well, why do you wait a couple of weeks? And when you get right down to it, there's no law that says that's too long. It's not too long. What happened is promptly after MedPro pays the Judnick settlement, it has to put together figures with respect to claims expense. And then once they find out how much Silvercross is supposed to reimburse, they send the letter. It's a delay of no more than a couple of weeks. In the context of this suit, where Silvercross filed a complaint saying, court, we would like you to determine the applicability of the SIR as to, and this is quoted in the state and effects in our brief, as to the cases pending against Silvercross in both Will and Cook Counties. The Will County case, Frego. The Cook County case, Judnick. It was that issue being litigated at the very time that this went on. I don't have time for anything else. Our position is that the court affirm the judgment with respect to the direct appeal, but reverse in favor of the cross appeal. And I think we're looking at a remand. Thank you, Your Honors. Thank you, Mr. Horstman. Ms. Mignon. Just briefly, Your Honors, to address the last points, with respect to the summary judgment entered by the trial court as to the Judnick claim, and that, again, was based on a finding of implied waiver, we'd ask this court to affirm that ruling. You've just heard from MedPRO's counsel that there was no evidence in the record to support an implied waiver on MedPRO's part. But you need to hear more of a factual background to get to how this implied waiver argument developed. First, to say that the trial court erred in determining this issue as a matter of law is quite interesting because MedPRO filed a cross motion for summary judgment on this issue and therefore conceded that there were no questions of fact, there was no necessity for a trial, and it was only after MedPRO lost the motion for summary judgment on Judnick that it filed a motion to reconsider and vacate saying, oh, wait, there's a question of fact here. Now, MedPRO criticizes Silver Cross for not bringing in the person who reportedly handled the Judnick claim, but MedPRO had its own cross motion for summary judgment and could have appended this person's affidavit to that motion for summary judgment and brought it all at issue just as easily as Silver Cross could have deposed this person. The facts that support the implied waiver claim as to Judnick are these. The Judnick lawsuit was filed in December of 2000. The verdict came down for approximately $8 million in January of 2004. Silver Cross filed this DEC action in September of 2004. That was one month after the verdict in the Frigo case had come down. We get to May of 2007 before MedPRO says anything or puts anything at issue in the DEC action about, oh, Silver Cross, you owe us an SIR payment for the Judnick claim. That's a huge delay. It's not a delay just in terms of a number of weeks. The issue with respect to SIR and the Judnick claim had been on MedPRO's radar since 2003. They were talking about it with the Frigo claim. The discussions that Croy and Abney had about Frigo also encompassed Judnick. There had been discussion about what are we going to do with this SIR issue? What are we going to do? Back in 2003, yet it's not until 2007 that MedPRO decides to make it an issue in this DEC action. That was what the trial court based the implied waiver finding on. Again, MedPRO didn't act consistently with an intent to enforce what it claims is a clear obligation in its own policy language. Now, MedPRO will tell you that there's no implied waiver here because it didn't know it had a right to the SIR payment as to Judnick until the trial court made its summary judgment determination in Frigo. Well, the problem with that argument is that the dates don't add up. I mean, MedPRO filed its counterclaim as to the Judnick SIR issue in the spring of 2007, but the Frigo summary judgment order didn't get finalized until February of 2008. So procedurally, the timeframes don't add up with respect to all of the reasons they tried to explain away their delay in seeking an SIR payment from Silver Cross for the Judnick action. Is there either contract language or law that talks about when they need to make that demand for SIR? No, none that we could find and none that's been cited in the briefs. But we're not talking about a delay of a couple of weeks like what you just heard about. Again, the SIR issue for Judnick had been on MedPRO's radar since 03. So if your contractual right is so clear that you were owed a $2 million payment, as you claim, why the delay for some two and a half, three years, four years before you say anything? Counsel, you're blaming me. What was the date of the judgment? On Judnick? Yeah. It was in January of 2004. And in September of 2004, we filed the DEC action. Now, MedPRO's also intimating that by the verbiage we put in our complaint for declaratory judgment, that there were claims pending in Cook and Will County that were relevant to this SIR dispute. We didn't identify Frigo or Judnick by name in our complaint for declaratory judgment. What happened was MedPRO filed a counterclaim that specifically identified Frigo and said, trial court, this SIR dispute is about Frigo. But they said nothing about Judnick until 2007. Well, certainly there would be no SIR wouldn't be an issue until there was a judgment rendered, right? That's true. But Frigo, here's the thing. I think Frigo also wasn't finalized at the point where the dispute got put in the pleadings via a counterclaim. Frigo went on to be appealed to the appellate court and the Supreme Court, and there wasn't a payment on Frigo as to resolving the verdict, paying the verdict, until early 2008. Yet MedPRO made it part of the pleadings way back, way back at the beginning of our complaint for declaratory judgment. So to suggest that the two cases follow different tracks is not entirely true. This was an issue on MedPRO's radar since 2003. They didn't say anything. They didn't come to us looking for a payment. They made the payment. When did they make the payment? I'm sorry? When did they make the payment? MedPRO's representing that the payment as to Judnick was made in November of 2006. But there's not anything in the record that actually supports that. They cite an affidavit of one of their employees, but if you look at the affidavit, it doesn't exactly say when settlement was finalized. But we know that there were settlement discussions during the whole time that the Judnick case was up on appeal in front of the appellate court, and then there was an attempted PLA as well to the Illinois Supreme Court. In the first instance? Correct. Thank you very much for your attention. Thank you. Thank you. And Mr. Hershman? Thank you, Your Honor. Just a few comments on those points. Medical Protective filed a motion for summary judgment on this waiver issue with respect to Judnick based on a cellotex type theory. Our motion for summary judgment was based on the idea that it's their burden to prove the waiver. They have no evidence to prove the waiver. That's why we thought it was appropriate for summary judgment. The timeline that Ms. Mendel wants- Based on the evidence that was presented to the court at the time of the summary judgment. Right, but beyond that, we challenged them to come up with some evidence because at that point- Not what you're saying. The evidence there was insufficient to talk or disagree. Yes, yes, yes. Uh-huh. The date of the Judnick verdict is not accurate. The operative date is when MedPro paid the judgment. Until it paid the judgment, Silver Cross obviously didn't owe the SIR. And it's the date of the payment of the judgment, which is not contemporaneous with the date of the settlement. The case was settled. Payment was not immediate. It was several weeks later. Yes, we knew about the Judnick case. Of course. Yes, we knew that there might be a judgment. Of course. But we didn't-Medical Protective didn't actually pay the judgment until a few weeks before it demanded payment of the SIR. So we're all grown-ups here. We're all smart lawyers. Yes, we knew that there may be an SIR issue. What's the policy say about payment? Not because I'm- Yes, excuse me, but I personally don't- I haven't had access to the whole policy. How does this work? MedPro paid the entire judgment and asked for reimbursement? Or do you say, hey, you all pony up two million bucks and then we'll pony up the difference? The way the policy says it's supposed to work is when there's a settlement, Silver Cross is supposed to kick in its two and MedPro pays everything on top of that. Silver Cross wouldn't do it. So MedPro had to pay the whole- Whether it's settlement or judgment, either one? Settlement or judgment. Okay. That's the way it's supposed to work. We do disagree as to whether the SIR as applicable to the judgment case was part of this declaratory from the beginning. Yes, it wasn't added in the counterclaim until later. That's a matter of record. But by pleading that they wanted an adjudication as to the SIR applicable to the cases then pending against them in Will and Cook County, they naturally brought Judnick and Frigo into it. Well, before MedPro paid the judgment, did it send a letter to Silver Cross and say, you know, time to pay, you pay your two million and we'll pay the difference, or did they just pay it? You know, I have misspoken, and I want to correct that. There was a side agreement in effect that controlled who was going to pay. I did make a mistake. I think that Silver Cross did contribute to the payment on the Frigo claim pursuant to a side agreement. I misspoke when I was just representing that. The way the policy anticipates is that they're supposed to pay their SIR, and MedPro is supposed to pay on top of that all at once, more or less. But that didn't happen on the... Judnick. Judnick. Yeah, Judnick, MedPro had to pay everything. And they'd already demanded that Silver Cross pay their self-insured, and they said no? No. They paid. Being in the context of this declaratory, they felt they knew what Silver Cross was going to do, that is, refuse to pay the SIR. So MedPro went ahead and paid, and then a couple of weeks later asked for the SIR. On the waiver issue, Silver Cross's argument has repeatedly come back to this theme of the conduct of MedPro was inconsistent in handling Frigo in Judnick. But even assuming, arguably, that the treatment was inconsistent, that doesn't establish waiver. The standard for implied waiver is much, much higher. Further here, the trial court determined as a matter of law that there was an implied waiver. I say even if Silver Cross is correct that there was some inconsistency in the treatment of the two claims, they still have fallen far short of showing a waiver. I have nothing further to add. I'll say this. Thank you very much. Thank you both for your arguments today. We will take this matter under advisement. I'll get back to the witness position.